Brandon A. Keim (028831)
bkeim@frgalaw.com
**Frazer Ryan Goldberg & Arnold LLP**
1850 North Central Avenue, Suite 1800
Phoenix, AZ 85004
(602) 200-7399

*Attorneys for Defendant Stephen M. Kerr*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No. 2:19-cv-05432-DJH |
| Plaintiff, | |
| v. | **DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Stephen M. Kerr, | |
| Defendant. | |

Defendant Stephen M. Kerr ("Kerr") moves for partial summary judgment, pursuant to Fed. R. Civ. P. 56, that (1) the Internal Revenue Service ("IRS") acted arbitrarily and capriciously in calculating the penalties for Kerr's failure to file a Report of Foreign Bank and Financial Accounts ("FBAR"), and (2) the FBAR penalties are punitive in nature and excessive in violation of the Eighth Amendment. Kerr requests that the Court remand the action to the IRS for a recalculation of the FBAR penalties. This motion is supported by the following Memorandum of Points and Authorities and the attached exhibits filed concurrently herewith.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

The IRS's Criminal Investigation division pursued Kerr in 2011, and after more than three weeks of trial in 2013, Kerr was convicted of willfully failing to file an FBAR for 2007 and 2008. But during sentencing, the Court determined that the United States failed to prove any tax loss from Kerr's failure to report, and Kerr was sentenced to just ten months with the Bureau of Prisons and ordered to pay a fine of $10,400. Likely distraught with the lackluster result, a month after sentencing, the IRS's Criminal Investigation division urged its civil counterpart to assign a revenue agent "as soon as possible" to address Kerr's FBAR penalties because the statute of limitations was set to expire soon. With a looming statute of limitations, the IRS hurriedly calculated a $3.8 million civil penalty, overlooking important information and deviating from internal protocols in the process.

The IRS has the authority to calculate and assess civil FBAR penalties. But the Internal Revenue Manual (IRM) guides IRS employees in those determinations, and under the Administrative Procedure Act ("APA"), the IRS is bound to adhere to its own regulations. The IRS's $3.8 million penalty is arbitrary and capricious because incorrect valuation dates were used producing incorrect and overstated penalties that exceeded the regulatory maximum. The resulting penalties are excessive under the Eighth Amendment. As there is no genuine issue of material fact, Plaintiff is entitled to partial summary judgment as a matter of law, and the Court should remand this action to the IRS to re-calculate the penalties.[1]

---

[1] This Court determined by Order dated March 1, 2021 that Kerr is precluded from challenging whether he willfully failed to file an FBAR as to four of the five accounts. (Doc. 26). Whether Kerr was willful in failing to report the "placeholder account" remains a disputed issued, but the penalty associated with the placeholder account is $40,985, which is small in relation to the IRS's total $3.8 million penalty calculation. The parties would benefit from the Court's ruling on the calculation of the penalty before deciding whether Kerr was willful in failing to report the placeholder account.

## II.    FACTUAL BACKGROUND

*Forging Into International Markets with Incompetent Counsel*

In 2007, Kerr and a business partner sought to expand their business and retained Christopher Rusch ("Rusch"), a California attorney, to assist them in acquiring international investors and expanding their domestic business. Rusch represented himself as an expert in structuring international corporations to be compliant with United States tax laws. He actively pursued their business.

Based upon Rusch's assurances that he was an international tax expert and could assist in creating a foreign hedge fund which would allow foreign investors to invest in United States projects, Kerr and his business partner retained Rusch to assist them in expanding their business into the international market. They received repeated assurances from Rusch that the transactions would be totally legal and tax compliant under both United States and Swiss tax laws.

To create the foreign hedge fund and work on Kerr's behalf in the international market, Rusch requested that the taxpayer and his business partner e-mail copies of their passports to him. As Kerr had no reason to distrust Rusch, he and his business partner forwarded copies of their passports to Rusch. Unbeknownst to Kerr and his business partner, Rusch gave the passports to Gabris, an individual assisting Rusch in the international transactions. Gabris used the passports to open bank accounts listing Kerr as a beneficial owner. It is these bank accounts for which the government has asserted the proposed penalties for willful failure to file FBARs.

3

*IRS Criminal Conviction*

On December 8, 2011, Kerr was charged by Indictment with one count of Conspiracy (Count 1), two counts of Willful Subscription to False Individual Income Tax Returns (Counts 2 and 3), and two counts of Willful Failure to File FBARs (Counts 6 and 7). (Ex. 1 at 1, 6-17.) The government alleged that Kerr conspired with others to create an elaborate scheme of foreign bank accounts to defraud the United States Treasury. (Ex. 1 at 1-5) As part of those allegations, the government claimed that Kerr willfully failed to report income from those foreign accounts on his individual tax returns for 2007 and 2008. (Ex. 1 at 6-8, 14.) The government further alleged that Kerr failed to mark the box on Schedule B of his return indicating an interest in foreign bank accounts as well as failing to file the required form TDF 90-22.1 Foreign Bank Reporting Form (FBAR) for 2007 and 2008. (Ex. 1 at 16.)

In April 2013, after weeks of trial, the jury acquitted Kerr of one count of Conspiracy, but found him guilty of two counts of Willful Subscription to False Individual Income Tax Returns, and two counts of Willful Failure to File FBARs. (Ex. 2 at 1-6.) The United States urged that Kerr be sentenced to 60 months based on an alleged tax loss of $682,822. (Ex. 3.) At Kerr's sentencing hearing in September 2013, Honorable Judge James A. Teilborg determined that the United States "failed to carry its burden of proof by a preponderance of the evidence, much less by clear and convincing evidence, that the tax loss exceeds zero." (Ex. 4 at 151-52.) The Court sentenced Kerr to ten months with the Bureau of Prisons and ordered him to pay a total fine of $10,400. (Ex. 5 at 204—205.)

*FBAR Examination*

Likely distraught with the lackluster sentencing result, on October 24, 2013, IRS Special Agent Lisa Giovannelli urged the IRS to assign a revenue agent "as soon as possible" to address Kerr's FBAR penalties because the statutes would run on June 30, 2014, and June 30, 2015. (Ex. 6 at 2.) IRS Supervisory Special Agent Albert Childress requested the assignment of the revenue agent and explained to the IRS's civil examination division that they "are able to provide all of the evidence presented at trial so the computations should be fairly straight-forward." (Ex. 6 at 1.)

IRS Revenue Agent Teresa Mead was assigned to Kerr's FBAR penalty examination on November 5, 2013 (Ex. 6 at 1), and she issued her report on May 12, 2014, determining FBAR penalties on an account-by-account basis (Ex. 7 at USA-000870—71; Ex. 8 at USA-001371, USA-001377—78).

The IRS's Form 886-A, *Explanation of Items*, which details the IRS's penalty determinations for Kerr, notes that the June 30 balances were "unknown" for all five accounts for reporting years 2007 and 2008, and instead listed the "Maximum Balance" for use in calculating penalties. (Ex. 8 at USA-001381—83.) Ms. Mead agreed in her deposition testimony that she "didn't know the June 30 balance in the account[s]," (Ex. 9 at 37:19-21), that the June 30 balances were listed in her report as unknown (Ex. 9 at 43:5-11), and that she used account values as of January 1, October 31, and December 31 without adjustment (Ex. 9 at 45:24-25; 46:1-4; 48:14-16; 55:20-24; 74:6-9, 22-25; 75:1-4, 17-25; 76:1; 97:12-13).

Mead further testified that she was aware that the foreign accounts for which she was calculating penalties included stock, that the statements listed the names of the stock and the number of shares of stock (Ex. 9 at 64:10-18), but that she made no attempt to determine the value of the stock as of June 30 (Ex. 9 at 64:17-19) despite being aware that she could look up the values of publicly traded stock as of a certain date, e.g., the violation date of June 30 (Ex. 9 at 57:19-22; 65:1-14). When Ms. Mead was asked why she did not attempt to determine the value of the stocks contained in the accounts as of June 30, she replied, "I don't recall," a phrase that she used more than 60 times throughout her deposition. (Ex. 9 at 64:20-21; 65:15-16.) When Ms. Mead was asked what would help her recall why she chose not to determine the value of securities using publicly available information, she responded "I don't have an answer." (Ex. 9 at 66:5-20.) Although Ms. Mead made no attempt to value the stocks as of June 30 using publicly available information, she used the internet in her investigation when it suited her. Ms. Mead used OANDA.com's currency converter, and included a printout in her case file. (Ex. 9 at 65:20-22.)

The IRS's Form 886-A, *Explanation of Items*, indicates that "[s]tatements reflecting the June 30 account balances were not provided or otherwise were not available," and therefore, that "the penalty was computed based on the best available information, which was either the October 31 or December 31 balance." (Ex. 8 at USA-001386.) The phrase "best available information" is not found anywhere in the IRS's policy manual related to FBAR examinations. *See* IRM 4.26.16 (07-01-2008). Ms. Mead confirmed during her deposition that when she said, "best available," she actually meant

that it was "the information that [she] had." (Ex. 9 at 34:7-9.) The information that Ms. Mead used in calculating Kerr's FBAR penalty was "provided by the [IRS's] criminal investigation division," (Ex. 9 at 34:13-16) and Ms. Mead "never requested any additional information," (Ex. 9 at 34:10-12) because she was "requested by [IRS] criminal investigations not to contact the taxpayer," (Ex. 9 at 17:5-12).

Ms. Mead testified that the nature of Kerr's FBAR penalty examination was "not typical" because it was not assigned to her in the manner that a typical FBAR examination would be, it was not included in her inventory, and her time was applied to assisting criminal investigations. (Ex. 9 at 31:14-24.) Ms. Mead further testified that she could have submitted an exchange of information (EOI) request to obtain information related to the accounts, but that there was an "imminent statute" and therefore "not sufficient time to do so," and that even if there were enough time, the criminal investigation division had asked her not to request information. (Ex. 9 at 78:4-15.)

Hurried by the IRS's Criminal Investigation division and urged to use the information presented at trial without contacting Kerr, Ms. Mead deviated from the IRS's guidance in the FBAR penalty examination. The IRS's "Lead Sheets" for FBAR penalty examinations in effect when Ms. Mead calculated Kerr's FBAR penalties included twenty-nine steps. (Ex. 10 at USA-000897—911.) The IRS's twelfth step, titled "Work the FBAR case," explains to examiners that "[d]ocumenting account transactions, aggregate and maximum balances, is critical in determining penalty amounts and mitigation." (Ex. 10 at USA-000899.) The thirteenth and fourteenth steps detail Information Document Requests (IDRs) and Summonses (under both Title 26 and Tile

31) to help examiners obtain account transactions and balances. (Ex. 10 at USA-000899—900.) Ms. Mead testified that she documented that step 13, addressing IDRs, was "N/A" (not applicable) after direction from the IRS's Criminal Investigation division that she not contact Kerr, and "also discussions with [her] group manager not to send out the IDR." (Ex. 9 at 33:2-8.) Ms. Mead further testified that step 14, addressing Summonses, was "N/A" (not applicable) because the "[d]ecision had been made not to summons the information." (Ex. 9 at 33:11-14.) These deviations from IRS procedure were not typical as Ms. Mead testified that she would generally "issue a summons in an FBAR examination if after all means of obtaining bank statements were unsuccessful," and that she would "request an EOI, exchange of information." (Ex. 9 at 16:14-20.)

*Summary of Accounts and Penalty Calculations*

A summary of each account and the correct method of calculating the penalty, based on the information in the IRS's possession, is provided below:

*UBS Account No. 240-29962*

The statements within the IRS's possession at the time that the penalty was calculated for UBS Account No. 240-29962 reflected five different stocks were purchased and sold throughout 2008 and 2009. Those transactions could be traced to determine the number of shares on hand at June 30, 2008 and June 30, 2009. Once the number of shares was determined, the trading value of the shares could be determined at June 30, 2008 and June 30, 2009, and the stock/account values are as follows:

| TABLE 2: UBS ACCOUNT #240-29962 STOCK /ACCOUNT VALUES AT JUNE 30TH | | | | | |
|---|---|---|---|---|---|
| Ln | Stock Name | 2008 Stock Shs/ USD Value | | 2009 Stock Shs/USD Value | Reference to Schedule |
| 1 | Ecotality | 675,884 | $98,823 | 675,884 | $67,588 | Sch. 1.1 |
| 2 | Intelligentias Inc | 171,900 | $42,975 | 171,900 | $34,380 | Sch. 1.2 |
| 3 | Nascent Wine | 501,440 | $30,086 | 501,440 | $5,014 | Sch. 1.3 |
| 4 | Forex | 0 | $0 | 0 | $0 | Sch. 1.4 |
| 5 | Stratos | 193,565 | $329,061 | 193,565 | $329,061 | Sch. 1.5 |
| 6 | Cash Position | | $43,625 | | ($317) | Sch. 1.5 |
| 7 | *Corrected Account Values at June 30th* | | $544,570 | | $435,726 | |

(Ex. 11 at Ex. A, 4-5; Ex. 10 at USA-000971—1039.)

*UBS Account No. 240-375796*

The statements within the IRS's possession at the time that the penalty was calculated for UBS Account No. 240-375796 reflected three different stocks were purchased and sold throughout 2007 and 2008. Those transactions could be traced to determine the number of shares on hand at June 30, 2008 and June 30, 2009. Once the number of shares was determined, the trading value of the shares could be determined at June 30, 2008 and June 30, 2009, and the stock/account values are as follows:

| TABLE 3: UBS ACCOUNT #240-375796 STOCK /ACCOUNT VALUES AT JUNE 30TH | | | | | |
|---|---|---|---|---|---|
| Ln | Stock Name | 2008 Stock Shs/USD Value | | 2009 Stock Shs/USD Value | Reference to Schedule |
| 1 | Intelligentias Inc | 1,631,500 | $407,875 | 1,631,500 | $326,300 | Sch. 2.1 |
| 2 | Stratos | 300,000 | $510,000 | 300,000 | $510,000 | Sch. 2.2 |
| 3 | Nevastar Finance | 75.08 | $4,942 | 0 | $0 | Sch. 2.3 |
| 5 | Cash Position | | $52,571 | | $409 | Sch. 2.4 |
| 4 | *Corrected Account Values at June 30th* | | $975,388 | | $836,709 | |

(Ex. 11 at Ex. A, 5; Ex. 10 at USA-001074—1132.)

9

*UBS Account No. 240-478593*

The statements within the IRS's possession at the time that the penalty was calculated for UBS Account No. 240-478593 showed the account value at June 30, 2008 as $1,012,300 on a statement that included a multi-comparison of account values and changes between periods. Notwithstanding that information with the IRS's possession, the revenue agent used a value at December 31, 2007 of $3,046,607 for the 2007 penalty calculation, which amounts to a penalty of more than three times the appropriate amount. (Ex. 11 at Ex. A, 6; Ex. 10 at USA-001134—98.)

*UBS Account No. 240-2795734*

The agent selected a statement dated February 15, 2007 to value the account at June 30, 2008. That statement reflected a value balance of 100,000 CHF for which she converted to US Dollars of $81,970. But the information provided by the government included a statement dated March 7, 2007 which showed a closing value balance of 21.15 CHF. Since the March 2007 statement reflected a value closer to June 30, 2008, it is the best information available rather than the February 2007 statement as used by the IRS. It is most likely that account was closed in 2008 and therefore, the balance at June 30, 2009 is zero. (Ex. 11 at Ex. A, 6-7; Ex. 10 at USA-001045—70.)

*Pictet & Cie Account No. J-551531*

The IRS used the valuation amount at December 31, 2008 of $408,244 as the account value at June 30, 2009. The December 31, 2009 statement reflected the actual account value at June 30, 2009 as $90,458. Although the statement was not in the IRS's possession at the time that the penalty was calculated, had the IRS requested the

information from Kerr, or third parties, then it would have had the information available to it as it does now. (Ex. 11 at Ex. A, 7; Ex. 12; Ex. 10 at USA-001200—42.)

The examiner could have further investigated the balances because she ultimately received an extension of the statute of limitations from Kerr (Ex. 10 at USA-000883—96), but she chose not to do anything more, and instead, closed the case out to IRS Appeals for consideration. (Ex. 9 at 109:22-25, 110:1-9.)

*IRS Appeals' Consideration of FBAR Penalties*

The appeals officer assigned to review Kerr's FBAR penalties determined "that the date of violation could be something other than the filing date of the FBAR report," and because the examiner determined penalties as of certain dates, he "didn't do further work in making a calculation of the penalty." (Ex. 13 at 36:9-21.) The appeals officer knew how to determine the fair market value of publicly traded securities on a certain date but did not analyze the examiner's work to determine if she had used the fair market value of the securities at issue in the accounts. (Ex. 13 at 75-77.) The appeals officer relied on the examiner's penalty calculation and assumed it was correct. (Ex. 13 at 79-80.) The appeals officer believed that the penalty calculation was a hazard for the government. (Ex. 13 at 30-32.) Although he discussed recalculating the penalty with Kerr's counsel, he did not take any action. (Ex. 13 at 52:15-25, 53:1-21.) His final determination "was that it could not be recomputed." (Ex. 13 at 53:25, 54:1.)

On December 21, 2017, the appeals officer submitted a request to assess the FBAR penalties totaling $3,800,970 against Kerr. (Ex. 14 at USA-0009528—31.) The

penalties were assessed against Kerr on December 21, 2017, and the United States filed this suit on October 18, 2019.

*IRS Income Tax Audit*

In April 2016, the IRS began a civil examination of Kerr's income tax liabilities for taxable years 2007 and 2008, specifically focusing on the foreign accounts at issue in this case. On November 5, 2020, the United States Tax Court entered a stipulated decision, signed by an IRS attorney on behalf of the IRS and Kerr's counsel, determining that Kerr did not underreport his income tax liabilities for taxable years 2007 and 2008, and that he was not liable for a civil fraud penalty under I.R.C. § 6663 for either year. (Ex. 15 at 1-2.)

## III.   ARGUMENT

**A.   Standard of Review**

Rule 56 provides that summary judgment shall be granted if the record shows that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial responsibility of informing the Court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Where there are no disputes of material fact, the Court simply decides the legal issues. *See, e.g., N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 772 (9th Cir. 2011); *Alcarez v. Block*, 746 F.2d 593, 602-03 (9th Cir. 1984). Where there are potential disputes, the moving party must identify those portions of the pleadings and record that it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 322-23.

**B.      The IRS Acted Arbitrarily and Capriciously in its Hurried Attempt to Calculate Kerr's Penalties.**

Congress gave the IRS wide discretion to decide whether to assess an FBAR penalty, and the amount of such penalty, 31 U.S.C. § 5321(a)(5)(A), and in turn, the IRS delegated that discretion to its examiners assigned to make penalty determinations, IRM 4.26.16.4(6) (07-01-2008). The IRS provided guidance to its employees to help them exercise their discretion. IRM 4.26.16 (07-01-2008). This guidance is not in the form of regulations promulgated and codified under the APA with the corresponding ability for public notice and comment. Rather, this guidance can largely be found in the Internal Revenue Manual.

The Internal Revenue Manual does not have the force of law. *Fargo v. Comm'r.*, 447 F.3d 706, 713 (9th Cir. 2006). But "[i]t is a fundamental principle of administrative law that an agency is bound to adhere to its own regulations." *Service v. Dulles*, 354 U.S. 363, 388 (1957) (stating that an agency may not "proceed without regard" to the "substantive and procedural standards" it has "impose[d] upon [itself]"); *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); *Church of Scientology of California v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990) (holding that administrative agencies are required to adhere to their own internal operating procedures).

The IRS acted arbitrarily and capriciously in its hurried attempt to calculate Kerr's penalties because (1) the IRS failed to determine the foreign account values as of June 30, 2008 and June 30, 2009, the dates of the violations, (2) the IRS's use of foreign account

13

values on dates other than June 30 was not a reliable method of computing June 30, 2008 and June 30, 2009 balances and produced incorrect, and overstated amounts, and (3) the IRS's penalty calculations exceeded the FinCEN regulations maximum of $100,000. For these reasons, as detailed below, this Court should remand this action to the IRS to re-calculate the penalties.

**1.  The IRS failed to determine the foreign account values as of June 30, 2008 and June 30, 2009, the dates of the violations, and instead used January 1, October 31, and December 31 dates without adjustment or explanation.**

The FBAR must be filed on or before June 30th of the year following the calendar year to be reported. 31 C.F.R. § 103.27(c); IRM 4.26.16.2.2(2) (07-01-2008). That means that a citizen required to file an FBAR for the calendar year ending December 31, 2007 must file such FBAR on or before June 30, 2008, and similarly, an FBAR for calendar year ending December 31, 2008 must be filed on or before June 30, 2009.

If a defendant fails to timely file an FBAR, the maximum civil penalty that may be assessed against a defendant is either (i) $100,000 or (ii) 50 percent of the "balance in the [defendant's foreign] account *at the time of the violation.*" 31 U.S.C. § 5321(a)(5)(C)(i), (D)(ii) (emphasis added). The IRS's policy manual directs examiners that "[t]he date of a filing violation is June 30th of the year following the calendar year for which the accounts are being reported" and thus, "[t]he balance in the account at the close of June 30th is the amount to use in calculating the filing violation." IRM 4.26.16.4.5.5 (07-01-2008); *see also* IRM 4.26.16.4.5 (07-01-2008) ("[A] filing violation occurs on June 30th of the year following the calendar year to be reported."); IRM 4.26.17.5.5.1(2) (01-01-2007) ("The date of the transaction for report filing violations is June 30th of the year

14

following the calendar year for which the foreign financial account should be reported."). Despite clear guidance from the IRS to its examiners that the penalty is calculated using the June 30th account balances, the IRS's revenue agent assigned to Kerr's FBAR examination did not know the June 30 account balances and made no effort to determine such balances.

The IRS's Form 886-A, *Explanation of Items*, which details the IRS's penalty determinations for Kerr, notes that the June 30 balances were "unknown" for all five accounts for reporting years 2007 and 2008, and instead listed the "Maximum Balance" for use in calculating penalties. (Ex. 8 at USA-001381—83.) IRS Revenue Agent Teresa Mead, who was assigned to Kerr's FBAR penalty examination, agreed in her deposition testimony that she "didn't know the June 30 balance in the account[s]," (Ex. 9 at 37:19-21), that the June 30 balances were listed in her report as unknown (Ex. 9 at 43:5-11), and that she used account values as of January 1, October 31, and December 31 without adjustment (Ex. 9 at 45:24-25; 46:1-4; 48:14-16; 55:20-24; 74:6-9, 22-25; 75:1-4, 17-25; 76:1; 97:12-13).

Mead further testified that she was aware that the foreign accounts for which she was calculating penalties included stock, that the statements listed the names of the stock and the number of shares of stock (Ex. 9 at 64:10-18), but that she made no attempt to determine the value of the stock as of June 30 (Ex. 9 at 64:17-19) despite being aware that she could look up the values of publicly traded stock as of a certain date, e.g., the violation date of June 30 (Ex. 9 at 57:19-22; 65:1-14). When Ms. Mead was asked why she did not attempt to determine the value of the stocks contained in the accounts as of

June 30, she replied, "I don't recall," a phrase that she used more than 60 times throughout her deposition. (Ex. 9 at 64:20-21; 65:15-16.) When Ms. Mead was asked what would help her recall why she chose not to determine the value of securities using publicly available information, she responded "I don't have an answer." (Ex. 9 at 66:5-20.) Although Ms. Mead made no attempt to value the stocks as of June 30 using publicly available information, she used the internet in her investigation when it suited her. Ms. Mead used OANDA.com's currency converter, and included a printout in her case file. (Ex. 9 at 65:20-22.)

The IRS's Form 886-A, *Explanation of Items*, indicates that "[s]tatements reflecting the June 30 account balances were not provided or otherwise were not available," and therefore, that "the penalty was computed based on the best available information, which was either the October 31 or December 31 balance." (Ex. 8 at USA-001386.) The phrase "best available information" is not found anywhere in the IRS's policy manual related to FBAR examinations. *See* IRM 4.26.16 (07-01-2008). Ms. Mead confirmed during her deposition that when she said, "best available," she actually meant that it was "the information that [she] had." (Ex. 9 at 34:7-9.) The information that Ms. Mead used in calculating Kerr's FBAR penalty was "provided by the [IRS's] criminal investigation division," (Ex. 9 at 34:13-16) and Ms. Mead "never requested any additional information," (Ex. 9 at 34:10-12) because she was "requested by [IRS] criminal investigations not to contact the taxpayer," (Ex. 9 at 17:5-12).

Ms. Mead testified that the nature of Kerr's FBAR penalty examination was "not typical" because it was not assigned to her in the manner that a typical FBAR

examination would be, it was not included in her inventory, and her time was applied to assisting criminal investigations. (Ex. 9 at 31:14-24.) Ms. Mead further testified that she could have submitted an exchange of information (EOI) request to obtain information related to the accounts, but that there was an "imminent statute" and therefore "not sufficient time to do so," and that even if there were enough time, the criminal investigation division had asked her not to request information. (Ex. 9 at 78:4-15.) In April 2013, after weeks of trial, the jury acquitted Kerr of one count of Conspiracy, but found him guilty of two counts of Willful Subscription to False Individual Income Tax Returns, and two counts of Willful Failure to File FBARs. (Ex. 2 at 1-6.) The United States urged that Kerr be sentenced to 60 months based on an alleged tax loss of $682,822. (Ex. 3.) At Kerr's sentencing hearing in September 2013, Honorable Judge James A. Teilborg determined that the United States "failed to carry its burden of proof by a preponderance of the evidence, much less by clear and convincing evidence, that the tax loss exceeds zero." (Ex. 4 at 151-52.) The Court sentenced Kerr to ten months with the Bureau of Prisons and ordered him to pay a total a criminal monetary fine of $10,400. (Ex. 5 at 204—205.) Likely distraught with the lackluster sentencing result, on October 24, 2013, IRS Special Agent Lisa Giovannelli urged that the IRS assign a revenue agent "as soon as possible" to address Kerr's FBAR penalties because the statutes would run on June 30, 2014, and June 30, 2015. (Ex. 6 at 2.) IRS Supervisory Special Agent Albert Childress requested the assignment of the revenue agent and explained to the IRS's civil examination division that they "are able to provide all of the evidence presented at trial so the computations should be fairly straight-forward." (Ex. 6 at 1.) Hurried by the IRS's

Criminal Investigation division and urged to use the information presented at trial without contacting Kerr, Ms. Mead deviated from the IRS's guidance in the FBAR penalty examination.

The IRS's "Lead Sheets" for FBAR penalty examinations in effect when Ms. Mead calculated Kerr's FBAR penalties included twenty-nine steps. (Ex. 10 at USA-000897—911.) The IRS's twelfth step, titled "Work the FBAR case," explains to examiners that "[d]ocumenting account transactions, aggregate and maximum balances, is critical in determining penalty amounts and mitigation." (Ex. 10 at USA-000899.) The thirteenth and fourteenth steps detail Information Document Requests (IDRs) and Summonses (under both Title 26 and Tile 31) to help examiners obtain account transactions and balances. (Ex. 10 at USA-000899—900.) Ms. Mead testified that she documented that step 13, addressing IDRs, was "N/A" (not applicable) after direction from the IRS's Criminal Investigation division that she not contact Kerr, and "also discussions with [her] group manager not to send out the IDR." (Ex. 9 at 33:2-8.) Ms. Mead further testified that step 14, addressing Summonses, was "N/A" (not applicable) because the "[d]ecision had been made not to summons the information." (Ex. 9 at 33:11-14.) These deviations from IRS procedure were not typical as Ms. Mead testified that she would generally "issue a summons in an FBAR examination if after all means of obtaining bank statements were unsuccessful," and that she would "request an EOI, exchange of information." (Ex. 9 at 16:14-20.)

The IRS's failure to use the balances in the accounts at the close of June 30th, and its failure make any effort to determine such balances, was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

In *United States v. Gentges*, No. 18-CV-7910 (KMK), 2021 WL 1222764 (S.D.N.Y. Mar. 31, 2021), the IRS used a December 31 balance in lieu of a June 30 balance in a willful FBAR penalty calculation, like in this case, because the IRS did not have the June 30 balance. *Gentges* at *15-16. The IRS argued that it used the "best available information," but the court held that IRS's policy manual required the June 30 account balance, and the agency's decision was an "arbitrary expedient." *Id.* The court remanded the issue to the IRS for additional investigation or explanation. *Id.* *16. The court distinguished the IRS's departure from "cut-and-dry instructions in its own internal guidelines" that it use the June 30 balance from other cases that involved the IRS's "substantive exercise of discretion." *Id.*, citing *United States v. Rum*, 2019 WL 3943250 (M.D. Fla. Aug. 2, 2019) (upholding IRS penalty calculation where the IRS did not apply mitigation provisions); *United States v. Williams*, 2014 WL 3746497 (E.D. Va. June 26, 2014) (upholding IRS's refusal to reduce FBAR penalties below the maximum). The *Gentes* court found that the IRS's failure to use June 30 balances was like *United States v. Schwarzbaum*, 2020 WL 1316232, (S.D. Fla. Mar. 20, 2020), and *Jones v. United States*, 2020 WL 2803353 (C.D. Cal. May 11, 2020), where the IRS's penalties were based on inappropriate data resulting in an IRS calculation that was arbitrary and capricious. *Gentges* at *16.

Like in *Gentges, Schwarzbaum,* and *Jones*, the IRS's failure to use the June 30 balances was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Accordingly, the Court should remand this action to the IRS to re-calculate the penalties using June 30 balances.

>  **2.   The IRS's use of foreign account values on dates other than June 30 was not a reliable method of computing balances on the violation dates, and it produced incorrect and overstated amounts.**

The IRS policy manual directs examiners to use the fair market "value of stock, other securities, and other non-monetary assets in an account reported on the FBAR." IRM 4.26.16.3.6 (07-01-2008). Although outside the FBAR penalty section of the IRS's policy manual, agents are directed that they may perform stock valuations as of a certain date using the "EstateVal" program. IRM 4.25.2.5.3.2 (08-30-2018). The IRS has utilized EstateVal to value stock since 1996. EVP System EstateVal, https://www.evpsys.com/group/estateval (last visited June 24, 2021).

IRS Revenue Agent Teresa Mead testified that she used account values as of January 1, October 31, and December 31 without adjustment to calculate Kerr's FBAR penalties. (Ex. 9 at 45:24-25; 46:1-4; 48:14-16; 55:20-24; 74:6-9, 22-25; 75:1-4, 17-25; 76:1; 97:12-13.) Mead further testified that she was aware that the foreign accounts for which she was calculating penalties contained stock, that the statements listed the names of the stock and the number of shares of stock (Ex. 9 at 64:10-18), but that she made no attempt to determine the value of the stock as of June 30 (Ex. 9 at 64:17-19) despite being aware that she could look up the values of publicly traded stock as of a certain date, e.g., the violation date of June 30 (Ex. 9 at 57:19-22; 65:1-14).

*UBS Account No. 240-29962*

The statements within the IRS's possession at the time that the penalty was calculated for UBS Account No. 240-29962 reflected five different stocks were purchased and sold throughout 2008 and 2009. Those transactions could be traced to determine the number of shares on hand at June 30, 2008 and June 30, 2009. Once the number of shares was determined, the trading value of the shares could be determined at June 30, 2008 and June 30, 2009, and the stock/account values are $544,570 and $435,726 at June 30, 2008 and June 30, 2009. (Ex. 11 at Ex. A, 4-5; Ex. 10 at USA-000971—1039.)

*UBS Account No. 240-375796*

The statements within the IRS's possession at the time that the penalty was calculated for UBS Account No. 240-375796 reflected three different stocks were purchased and sold throughout 2007 and 2008. Those transactions could be traced to determine the number of shares on hand at June 30, 2008 and June 30, 2009. Once the number of shares was determined, the trading value of the shares could be determined at June 30, 2008 and June 30, 2009, and the stock/account values are $975,388 and $836,709 at June 30, 2008 and June 30, 2009. (Ex. 11 at Ex. A, 5; Ex. 10 at USA-001074—1132.)

*UBS Account No. 240-478593*

The statements within the IRS's possession at the time that the penalty was calculated for UBS Account No. 240-478593 showed the account value at June 30, 2008 as $1,012,300 on a statement that included a multi-comparison of account values and

changes between periods. Notwithstanding that information with the IRS's possession, the revenue agent used a value at December 31, 2007 of $3,046,607 for the 2007 penalty calculation, which amounts to a penalty of more than three times the appropriate amount. (Ex. 11 at Ex. A, 6; Ex. 10 at USA-001134—98.)

*UBS Account No. 240-2795734*

The agent selected a statement dated February 15, 2007 to value the account at June 30, 2008. That statement reflected a value balance of 100,000 CHF for which she converted to US Dollars of $81,970. But the information provided by the government included a statement dated March 7, 2007 which showed a closing value balance of 21.15 CHF. Since the March 2007 statement reflected a value closer to June 30, 2008, it is the best information available rather than the February 2007 statement as used by the IRS. It is most likely that account was closed in 2008 and therefore, the balance at June 30, 2009 is zero. (Ex. 11 at Ex. A, 6-7; Ex. 10 at USA-001045—70.)

*Pictet & Cie Account No. J-551531*

The IRS used the valuation amount at December 31, 2008 of $408,244 as the account value at June 30, 2009. The December 31, 2009 statement reflected the actual account value at June 30, 2009 as $90,458. Although the statement was not in the IRS's possession at the time that the penalty was calculated, had the IRS requested the information from Kerr, or third parties, then it would have had the information available to it as it does now. (Ex. 11 at Ex. A, 7; Ex. 12; Ex. 10 at USA-001200—42.)

The IRS made unreliable assumptions in determining the account values at June 30, 2008 and June 30, 2009 and the penalty calculations should be corrected. The FBAR penalties would be correctly computed as follows:

| Ln | Account | June 30th | Corrected Penalty | Penalty Per Gov't | Difference |
|---|---|---|---|---|---|
| | **TABLE 8 : SUMMARY OF CORRECTED WILLFUL FBAR PENALTIES** | | | | |
| 1 | UBS AG Account #240-229962 | 2008 | $277,285 | $378,117 | ($100,832) |
| 2 | UBS AG Account #240-375796 | 2008 | 487,694 | 718,085 | (230,391) |
| 3 | UBS AG Account #240-478593 | 2008 | 506,150 | 1,523,303 | (1,017,153) |
| 4 | UBS AG Account #240-279734 | 2008 | *40,985* | 40,985 | 0 |
| 5 | Pictet & Cie Account #J-551531 | 2008 | *250,761* | 250,761 | 0 |
| 6 | Subtotal – June 30, 2008 (tax  year 2007 | | $1,562,875 | $2,911,251 | ($1,348,376) |
| 7 | | | | | |
| 8 | UBS AG Account #240-229962 | 2009 | *$100,000* | $100,000 | $0 |
| 9 | UBS AG Account #240-375796 | 2009 | 100,000 | 100,000 | 0 |
| 10 | UBS AG Account #240-478593 | 2009 | 485,597 | 485,597 | 1 |
| 11 | UBS AG Account #240-279734 | 2009 | 0 | 0 | 0 |
| 12 | Pictet & Cie Account #J-551531 | 2009 | 45,229 | 204,122 | (158,893) |
| 13 | Subtotal-June 30, 2009 (tax year 2008) | | $730,826 | $889,719 | ($158,893) |
| 14 | | | | | |
| 15 | TOTAL OF BOTH YEARS | | $2,293,701 | $3,800,970 | ($1,507,269) |

(Ex. 11 at Ex. A, 10.) The correctly computed penalties appearing above account for the six-year statute of limitations that apply to FBAR penalty assessments, which runs from the FBAR due date. 31 U.S.C. § 5321(b)(1); *see also United States v. Bussell*, 699 Fed. Appx. 695, 696 (9th Cir. 2017), *cert. denied*, 138 S.Ct. 1697 (2018); *United States v. Gardner*, No. 2:18-CV-03536-CAS-E, 2019 WL 1767120 USCA11 Case: 20-12061 (C.D. Cal. Apr. 22, 2019). The statute of limitations expired before the United States filed this lawsuit, and the IRS is new precluded from increasing the penalties against Kerr on an account-by-account basis.

Because the IRS's use of foreign account values on dates other than June 30 was not a reliable method of computing balances on the violation dates, and it produced incorrect and overstated amounts, the Court should remand this action to the IRS to re-calculate the penalties.

1

2

### 3.   The IRS's penalty calculations exceed the FinCEN regulations maximum of $100,000.

For willful FBAR violations, the maximum statutorily authorized penalty is the greater of $100,000 or 50 percent of the relevant account balance. 31 U.S.C. § 5321(a)(5)(C). However, the implementing regulation caps the penalty at $100,000. 31 CFR § 1010.820(g). The IRS has consistently taken the position that 31 CFR § 1010.820(g) is *void ab initio* since 2004, when Congress increased the willful penalty (American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418 (2004)) and assessed amounts greater than the $100,000. Two courts have held that that the regulation controls. *See United States v. Wadhan*, 325 F. Supp. 3d 1136, 1138-41 (D. Colo. 2018); *United States v. Colliot*, 2018 WL2271381 at *2-3 (W.D. Tex. May 16, 2018). While there are no controlling cases in the Ninth Circuit, most courts to address the issue have concluded that the 2004 amendment to the statute superseded the regulation. *See United States v. Rum*, 995 F.3d 882 (11th Cir. 2021); *United States v. Horowitz*, 978 F.3d 80, 91 (4th Cir. 2020); *Norman v. United States*, 942 F.3d 1111 (Fed. Cir. 2019); *Kimble v. United States*, 141 Fed. Cir. 373, 388 (2018); *United States v. Park*, 389 F. Supp. 3d 561, 571-74 (N.D. Ill. 2019); *United States v. Toth*, No. 15-CV-13367-ADB, 2020 WL 5549111, at *5 (D. Mass. Sept. 16, 2020); *United States v. Shoenfeld*, 2019 WL 2603341 at *4 (M.D. Fla. June 25, 2019); *United States v. Garrity*, 2019 WL 1004584 at 2 (D. Conn. Feb. 28, 2019). The $100,000 cap has not been amended or rescinded despite that the regulation has been amended for other purposes as recently as 2016. 81 Fed. Reg. 42503 (June 30, 2016). Accordingly, any civil penalty is limited to the greater of the

amount in the account at the time of the violation but capped at $100,000 and the Court should remand this action to the IRS to re-calculate the penalties using the $100,000 cap.

## C.   FBAR penalties that are more than 1.5 times the amounts in the accounts are punitive in nature and excessive in violation of the Eighth Amendment.

The Eighth Amendment of the United States Constitution prohibits the government from imposing "excessive fines." U.S. Const. amend. VIII. The Eighth Amendment applies to civil and criminal sanctions so long as some purpose of the sanction is to punish. *Austin v. United States*, 509 U.S. 602, 610 (1993). Forfeitures are "fines" within the meaning of the Excessive Clause if they constitute punishment for an offense. *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Because the FBAR penalties assessed against Kerr serve a punitive or deterrent purpose, IRM 4.26.16.6 (11-06-2015) (FBAR penalties "should be determined to promote compliance with the FBAR reporting and recordkeeping requirements"), the Eighth Amendment is triggered. *United States v. Bussell*, 2015 WL 9957826 (C.D. Cal. 2017); *United States v. Garrity*, 2019 WL 1004584 (D. Conn. Feb. 28, 2019); s*ee also Bajakajian*, 524 U.S. at 329.

Once the Eighth Amendment is triggered, courts are guided by four factors to determine whether a penalty is grossly disproportional: (1) the nature and extent of the crime; (2) whether the violation was related to other illegal activities; (3) the maximum sentence and fine that could have been imposed; and (4) the extent of the harm caused. *Id.* at 337-40. The FBAR penalties asserted against Kerr are not proportional because (1) the only crime that Kerr committed was the failure to report foreign accounts that were unconnected to any other criminal purpose; (2) the violation was unrelated to any other criminal activity; (3) the maximum criminal sentence and fine of 10 years and $500,000 plus 50% of the account balance are grossly disproportional to the violation committed and were overstated by the examiner; and (4) the government suffered no injury as it stipulated that Kerr did not underreport his tax liabilities.

1
2
3
4
5
6
7
8
9

The purpose of the FBAR filing requirement is to facilitate the acquisition of information to assist in the enforcement of criminal laws. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 76 (1974). The FBAR penalty targets individuals who fail to disclose their interest in foreign accounts because the failure to disclose prevents the government from investigating money laundering, drug trafficking, tax evasion, and illicit activity. 31 U.S.C. § 5311. Kerr's mere failure to disclose is a reporting violation, and when unconnected to any other illegal activity, penalties totaling $3.8 million, which is more than 1.5 times the amounts in the accounts (162% of the corrected values as of June 30, 2009), are grossly disproportional to the violation committed.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

In *Bajakajian,* the defendant failed to report the removal of currency from the United States when he was stopped at the airport with $357,144 in his suitcase. *Bajakajian*, 524 U.S. at 324. The violation was unconnected to any other illegal activity and was solely a reporting violation, but the defendant was forced to forfeit the entire amount. *Id.* The Supreme Court held that the full forfeiture was grossly disproportional to the offense and a violation of the Excessive Fines Clause of the Eighth Amendment. *Id.* at 329. The Court reasoned that the statute was designed for money launderers, drug trackers, and tax evaders, and that the defendant did not fit into the class of persons for whom the statute was designed. *Id.* Like in *Bajakajian*, Kerr's violation is solely a reporting violation that is unconnected to any other illegal activity. The Court determined at Kerr's sentencing hearing that the government failed to prove that the tax loss exceed zero (Ex. 4 at 151-52), and after a civil income tax examination, the IRS stipulated that Kerr had no tax deficiency (Ex. 15 at 1-2). Also similar to *Bajakajian*, Kerr is being forced to forfeit *more than the entire amount* in the accounts through the FBAR penalties because the penalties exceed the account values as of June 30, 2009 by more than 1.5 times.

26
27
28

In *Bussell*, the defendant funneled money from her medical practice into a Swiss bank account. *Bussell* at *1. The defendant was convicted of tax evasion. *Id.* The court reduced the defendant's FBAR penalty from $1,221,806 to $1,120,513 because it

exceeded the maximum penalty set out in criminal and civil statutes. *Id.* at *9. Although the defendant was convicted of tax evasion, the court reasoned that tax evasion "is not as serious as some crimes that ultimately trigger civil forfeiture actions." *Id.* at *8-9. Unlike *Bussell*, Kerr did not evade tax, and the IRS stipulated that Kerr had no tax deficiency after conducting a civil examination. Like *Bussell*, Kerr's penalties exceed the maximum penalty, as set forth above, because the IRS used foreign account values on dates other than June 30.

Kerr's FBAR penalties are fines that are grossly disproportionate to the conduct involved—a mere failure to report—and the punishment is unconstitutional under the Excessive Fines Clause of the Eighth Amendment after weighing the relevant factors and comparing the FBAR penalties of $3.8 million to the additional tax due—zero—and considering that the penalties amount to more than 1.5 times the amounts in the accounts as of June 30, 2009. The Court should reduce the FBAR penalties to 50% of the account balances as of June 30, 2009, or $1,167,044.

## IV.    CONCLUSION

Based on the foregoing, this Court should grant Kerr's Partial Motion for Summary Judgment.

RESPECTFULLY SUBMITTED this this 24th day of June, 2021.

> */s/ Brandon A. Keim*
> Brandon A. Keim (028831)
> **FRAZER RYAN GOLDBERG & ARNOLD LLP**
> 1850 N. Central Ave, Suite 1800
> Phoenix, AZ 85004
> Phone: 602-200-7399; Fax: 602-200-7339
> E-mail: bkeim@frgalaw.com
>
> *Attorneys for Defendant*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF EXHIBITS

The following table of exhibits is provided in accordance with the Court's Rule 16 Scheduling Order:

| Exhibit No. | Title |
|---|---|
| 1 | Indictment |
| 2 | Verdicts |
| 3 | Government's sentencing memorandum |
| 4 | Sentencing transcript, day one |
| 5 | Sentencing transcript, day two |
| 6 | Assignment emails |
| 7 | Case Activity Record |
| 8 | FBAR Examination Report |
| 9 | Teresa Mead deposition transcript |
| 10 | Examiner's workpapers |
| 11 | Declaration of Sheri L. Betzer |
| 12 | Pictet J-551531.001 Statement at December 31, 2009 |
| 13 | Eric Hughes deposition transcript |
| 14 | Assessment emails |
| 15 | United States Tax Court Decision |

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing is made this 24th day of June, 2021, via the Court's ECF system to all counsel of record.

/s/ Brandon A. Keim
BRANDON A. KEIM
*Attorneys for Defendant*